# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5783-13

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

C.E.L.,

     Defendant-Appellant.

_____

Argued October 19, 2017 – Decided August 31, 2018
Remanded by Supreme Court November 6, 2020
Reargued February 9, 2021 – Decided March 2, 2021

Before Judges Haas, Mawla, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 11-03-0672.

Louis H. Miron, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Louis H. Miron, on the briefs).

Catherine A. Foddai, Legal Assistant, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; William P. Miller, Assistant Prosecutor, of counsel; Catherine A. Foddai, on the brief).

PER CURIAM

Following a jury trial, defendant C.E.L. was convicted of first-degree aggravated sexual assault of a victim less than thirteen years old (his four-year-old daughter, C.L.), N.J.S.A. 2C:14-2(a)(1) (count one); three counts of second-degree sexual assault of a victim less than thirteen years old, N.J.S.A. 2C:14-2(b) (counts two, three, and four); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count five); and third-degree hindering prosecution by preventing or obstructing the child victim from providing testimony or information that might aid in his discovery or apprehension or in the lodging of a charge against him, N.J.S.A. 2C:29-3(b)(3) (count six). State v. C.E.L., No. A-5783-13 (App. Div. Aug. 31, 2018) (slip op. at 1-2). In this opinion, we will refer to these six counts as the "sexual abuse charges."

The jury also convicted defendant of fourth-degree endangering the welfare of a child by possessing or viewing child pornography, N.J.S.A. 2C:24-4(b)(5)(b) (count seven); and fourth-degree tampering with evidence by attempting to delete images of child pornography from a computer, with the purpose of impairing its verity or availability in an official proceeding or investigation, N.J.S.A. 2C:28-6(1) (count eight). Id. at 2. We refer to these two

2

counts as the "child pornography charges." Defendant thereafter filed an appeal to this court.

Thirty days before we issued our opinion on appeal on August 31, 2018, our Supreme Court held that Child Sexual Abuse Accommodation Syndrome (CSAAS) evidence "no longer . . . has a sufficiently reliable basis in science to be the subject of expert testimony[,]" and limited such testimony to "only one aspect of the theory -- delayed disclosure -- because scientists generally accept that a significant percentage of children delay reporting sexual abuse." State v. J.L.G., 234 N.J. 265, 272 (2018). Although the State introduced CSAAS evidence at the trial, we did not address J.L.G. in our decision because defendant did not raise the issue of the admissibility of this evidence on appeal. Defendant subsequently filed a motion for reconsideration raising the CSAAS issue for the first time, and we denied this motion on December 7, 2018. Defendant then filed a petition for certification and challenged the admissibility of the State's CSAAS evidence.

On August 5, 2020, the Court rendered its decision on J.L.G.'s pipeline retroactivity and deemed its determination applicable to any cases on direct appeal at the time of its ruling. State v. G.E.P., 243 N.J. 362, 386-89 (2020).

A-5783-13

Defendant's petition was still pending at that time and, therefore, J.L.G. applied to the CSAAS issue he raised.

On November 6, 2020, the Court granted defendant's petition and summarily remanded to this court "to reconsider in light of State v. G.E.P." State v. C.E.L., 244 N.J. 352 (2020). As we perceive our task, we must consider whether the CSAAS testimony adduced by the State at trial exceeded the now permissible bounds of such evidence and, if so, whether under the particular facts of this case, its admission resulted in harmful error requiring the reversal of any or all of the eight charges of which defendant was convicted. G.E.P., 243 N.J. at 389-90. We provided the parties with the opportunity to file supplemental briefs and to have oral argument on these issues.

After reviewing the evidence presented during defendant's trial as governed by the principles of law set forth in J.L.G. and G.E.P., we conclude the expert CSAAS testimony presented in this case exceeded the scope now permitted by J.L.G. With regard to the sexual abuse charges, we further conclude that the admission of this evidence "raise[s] a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached" on these six charges. Id. at 390 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). We

A-5783-13

are therefore constrained to reverse defendant's convictions on counts one through six of the indictment.

However, because there was strong, independent evidence presented by the State's computer forensic expert concerning his discovery of pornographic images of children on defendant's computers and defendant's attempts to delete that material from his devices, we find that the admission of the CSAAS evidence did not deny defendant "a fair decision on the merits" on counts seven and eight of the indictment. Ibid. (quoting State v. Mohammed, 226 N.J. 71, 87 (2016)). Therefore, we affirm defendant's convictions on the child pornography charges.

## I.

The parties are familiar with the facts set forth in our prior decision, which we incorporate by reference. C.E.L., (slip op. at 1-40). Therefore, we need only recite the most salient points here.

## A.

Concerning the six sexual abuse charges, the State primarily relied upon the videotaped statements of C.L., defendant's four-year-old daughter. Id. at 5-22. C.L. told the police during her interview that defendant had sexually

A-5783-13

assaulted her on numerous occasions prior to October 6, 2010, the date she disclosed the abuse for the first time to her nanny, W.K. Ibid.

W.K. testified at the trial, but she did not witness any of the alleged assaults. Id. at 5-9. W.K. stated "that C.L. frequently urinated and defecated in her underpants[,]" and had done so on the day she reported her allegations to W.K. Id. at 5. However, the State presented the testimony of Dr. Julia De Bellis, who examined the child after she spoke to the police. Id. at 22. At that time, the doctor found "[a] small amount of fecal matter . . . around C.L.'s anus, and she had some mild redness in her genital area." Ibid. However, Dr. De Bellis "opined that the presence of fecal matter was merely indicative of poor hygiene, which was common in young children, and the genital redness was a nonspecific finding, meaning there could be many explanations for it." Ibid. Dr. De Bellis found "[n]o injuries or evidence of trauma" during her physical examination, but this finding "neither confirmed nor denied the validity of C.L.'s allegations of abuse." Ibid.

Dr. De Bellis's opinions were echoed by the testimony of Dr. Kimberly Kinney, who was one of the child's pediatricians. Dr. Kinney, who was called as a defense witness, testified that C.L. had some redness around her genitals

during a 2010 examination, and experienced enuresis and encopresis[1] for a number of months prior to that examination.  However, Dr. Kinney stated that both conditions are common among young children like C.L.  Dr. Kinney explained that enuresis and encopresis could be caused by any number of factors, including constipation, poor hygiene practices, behavioral issues, failing to schedule regular bathroom breaks, and stress.  Dr. Kinney testified that C.L. was "a very friendly, upbeat young lady."  Dr. Kinney reviewed the child's medical records and "found no evidence she suffered any trauma from sexual abuse."  Id. at 34.

On November 30, 2010, less than two months after C.L. reported the abuse to W.K. and the police, the child recanted her allegations during an interview with a private investigator.  Id. at 29-30.  She denied that her father ever touched her in an inappropriate manner.  Ibid.  At trial, C.L., who was then eight years old, "denied she told W.K. about things that happened between her and her father" and testified that she also told the police officer who interviewed her that defendant "didn't do anything."  Id. at 30.  C.L. testified that W.K. persuaded

---

[1]  The term "enuresis" refers to loss of bladder control and accidental urination, and "encopresis" encompasses stooling accidents.

A-5783-13

her to make false allegations against defendant and the child complied because she was afraid W.K. would hurt her and her brother.  Id. at 31.

During her interview with the police on October 7, 2010, C.L. stated that defendant put a "white" ointment on his penis during his assaults and also forced the child to use it on him.  At trial, she denied this occurred.  When asked whether she ever told the police about the ointment, the child stated that

> she walked into her parents' bedroom in the middle of the night, [and found] her father . . . lying on his side on his bed, wearing only a t-shirt and watching a movie on his laptop computer, and she saw him putting ointment on his [penis], which she described as appearing "like silk and gooey kind of."

[Id. at 31-32.]

However, the child "immediately contradicted herself by saying she never saw [defendant] put the ointment on his body and that the ointment container was merely lying behind him on the bed."  Id. at 32.

The prosecution presented testimony from Dr. Lynn Suzanne Taska, an expert in psychology, and specifically CSAAS.  She testified that CSAAS is "not a diagnosis," but instead "a list of behaviors that are frequently seen in children who have been sexually abused."  Those behaviors fall into five categories:  secrecy; helplessness; entrapment and accommodation; delayed and unconvincing disclosure; and retraction or recantation.

8

Reviewing all five of these behaviors, Dr. Taska explained that secrecy is a precondition for the abuse to occur, that is, abuse typically happens when the child and perpetrator are alone. "The other quality about secrecy has to do with how secrecy is maintained." In order to maintain secrecy, Dr. Taska testified that abusers may offer the child a bribe, or a reward, for keeping the abuse secret, or they may threaten the child, or tell the child that something bad will happen if they disclose the abuse.

Turning to the second behavior, helplessness, Dr. Taska testified that children are dependent upon the adults around them. They do not have the same power as adults, and they are routinely told to obey the adults in their lives. Describing the third category, entrapment and accommodation, Dr. Taska testified that because sexual abuse is generally not a one-time experience, abused children "find a way to accommodate or adapt to that experience."

Dr. Taska next explained the fourth factor, delayed and unconvincing disclosure. She testified that children often do not disclose abuse immediately after it occurs. If they disclose, their disclosure tends to be delayed, and "[i]t's not the kind of statement that law enforcement would really like, where it's clear, labeling everything. It tends to be waffling. It tends to be unclear."

9

Finally, Dr. Taska stated that recantation, the fifth behavior, "refers to the child trying to take it back. The child basically says I lied or I made it up, it didn't happen." Dr. Taska explained:

> [W]hat happens is the kid will sometimes accidental[ly] blurt this out or this comes out, and then all the stuff that the child feared happens. The child is charged with secrecy with keeping the family together. They tell. And then all this stuff happens, Child Protective Service[s], this process, . . . therapists get involved, the kid doesn't want that. And so they try to make that all go away. And sometimes there are forces in the family pushing kids to take it back.

In response to Dr. Taska's testimony, defendant presented the testimony of Dr. Phillip W. Esplin, an expert in forensic psychology. Dr. Esplin primarily criticized the manner in which the police conducted their October 7, 2010 interview with C.L. C.E.L., (slip op. at 34-37). However, he also discussed all five of the CSAAS behaviors during his testimony.

Defendant testified on his own behalf and "denied committing the acts alleged in the indictment and any of the acts alleged in C.L.'s statement to" the police. Id. at 33. He also presented several character witnesses.

In his summation, the prosecutor referenced Dr. Taska's CSAAS testimony during the portion of his argument where he addressed C.L.'s trial testimony. The prosecutor stated that the jury had heard "testimony about . . .

how might a child victim of sexual abuse act[,]" and asserted that this testimony "explains a lot about [C.L.'s] . . . testimony."  Referring to three of the five behaviors discussed by Dr. Taska, the prosecutor argued that the expert's testimony

> helps us to understand [C.L.'s trial testimony] because we . . . heard it testified to that a child victim of sexual abuse may feel helpless to stop it.  We heard that a child victim of sexual abuse may keep it a secret.  And we heard that a child victim of sexual abuse may recant the true disclosure.

The prosecutor then went on to describe these three behaviors in greater detail by referring to Dr. Taska's testimony and ended this discussion by focusing on how the CSAAS evidence could help explain C.L.'s recantation of her prior allegations.  The prosecutor stated:

> [A]s we understand from the research and the [CSAAS], recantations happen.  As we heard in the testimony, in family cases, all the things that the child fears happen after disclosure.  Okay?  In this case, [C.L.] feared not having a regular family with her dad there even more.  Recantations happen because forces in the family start pushing at the child to take it back.

Continuing to drive this point home, the prosecutor continued:

> You recall that Dr. Taska talked about a study . . . Dr. Esplin confirmed it, as well, that recantations most likely occur where a parent figure was the perpetrator, the younger the child victim, non-offending parent is not supportive and the child is left in the home.  And in

11

that study, the recantations were occurring in . . . substantiated cases, so cases in which it was truly believed that the abuse had happened, not that it was questioned but when they did, it was substantiated, there were still recantations. And, as I said, Dr. Esplin agreed with these when he testified.

Following its deliberations, the jury convicted defendant of the sexual abuse charges set forth in counts one through six of the indictment.

B.

Turning to the two child pornography charges set forth in counts seven and eight of the indictment, the State presented the testimony of Yanal Bachok, a computer forensic analyst with the county prosecutor's office. Bachok examined the hard drives of a desktop computer and a laptop computer the police seized from defendant's home. Id. at 24. Bachok found that someone had attempted to delete all of the information on the hard drives of both devices, but had not been completely successful. Id. at 24-28.[2]

Thus, Bachok found "numerous images of suspected child pornography" on the laptop's hard drive, together with a number of "hits" for suspicious

_____

[2] In this regard, Bachok testified that a "system restore" procedure was initiated on defendant's laptop on October 7, 2010 to delete files, just ten minutes after defendant placed a telephone call to his wife, who was with C.L. at the police station. Ibid. Shortly thereafter, the police arrived at defendant's home, brought him to the station, and arrested him. Id. at 25-26.

"keywords" like "Underage," "Little Virgins," "Nymphets," and "Teenburg." Id. at 26-27. He also found evidence that the computer had been used to access "Limewire," which he explained was "'a peer-to-peer program for file sharing between computers,' that is often used for sharing illegal content, such as child pornography." Id. at 27.

On the desktop hard drive, Bachok found hundreds of "hits" for "keywords" similar to those found on the laptop, including "Limewire," "Index Lolita," and "preteens." Id. at 27-28. In addition, Bachok "found the program 'Cyberscrub' installed on the desktop computer, and explained that Cyberscrub is advertised as a program that deletes your internet history." Id. at 28. Bachok also discovered evidence that the Cyberscrub program had been installed on defendant's laptop. Ibid.

During his testimony, "[d]efendant blamed his father-in-law, K.W. for the child pornography found on his laptop computer." Id. at 37-38. Defendant admitted he had used Cyberscrub on his desktop computer "in order to eliminate unwanted material while retaining everything else." Id. at 38. Testifying on defendant's behalf, K.W. claimed "he used defendant's computers to view child pornography and claimed he had 'a sickness, an addiction,' to child pornography." Id. at 39.

As noted above, the jury convicted defendant of possessing child pornography and tampering with evidence by attempting to delete these illegal images form his computers as charged in counts seven and eight, respectively, of the indictment.

II.

We now turn to the two issues presented by the Supreme Court's direction that we reconsider our prior decision through the prism of J.L.G. First, we are satisfied that the CSAAS testimony presented by the State's expert exceeded the permissible bounds of such evidence and, to the extent the State argues otherwise, the contention lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). As summarized above, Dr. Taska addressed all five of the behaviors comprising the theory behind CSAAS. As the Court held in J.L.G., experts may not provide testimony on four of these five topics. 234 N.J. at 303. Therefore, the trial court erred in admitting testimony about CSAAS. Id. at 306.

We next determine whether the admission of the CSAAS testimony was plain error. See G.E.P., 243 N.J. at 389 (noting "[p]lain errors are those 'clearly capable of producing an unjust result'" (quoting R. 2:10-2)). In order to properly answer the question, "[t]he error[s] must be evaluated 'in light of the overall

14

strength of the State's case.'" State v. Prall, 231 N.J. 567, 588 (2018) (alterations in original) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)). Indeed, the Court has repeatedly engaged in such an evaluation in cases involving CSAAS testimony.

For example, in State v. J.R., a case that predated J.L.G., the Court concluded the CSAAS expert testimony "exceeded the parameters imposed" by prior precedent. 227 N.J. 393, 417 (2017). However, the Court considered the other trial evidence, including the victim's testimony, the testimony of "four family members" that was consistent with the victim's account, and defendant's "self-incriminating comments." Id. at 419-20. The Court concluded the expert's "brief venture beyond the proper bounds of CSAAS testimony [did not] change[] the result of defendant's trial." Id. at 420.

Similarly, in J.L.G. and in each of the four consolidated cases in G.E.P., the Court evaluated whether the inadmissible CSAAS testimony was harmful error in light of the strength of the State's evidence. In J.L.G., the Court concluded that the admissibility of CSAAS delayed disclosure testimony, like other expert testimony, "is not appropriate to explain what a jury can understand by itself." 234 N.J. at 305 (citing State v. Cain, 224 N.J. 410, 427 (2016)).

"Whether a victim's delayed disclosure is beyond the ken of the average juror will depend on the facts of the case."  Ibid.

Thus, if a child victim offers no "rational explanation for the delay in disclosing abuse[,]" expert testimony may be appropriate; conversely, the victim's "explanation from the witness stand may fall within the ken of the average juror and might be assessed without expert testimony."  Ibid.  The Court concluded that because the victim "gave sound reasons for the delay" during her testimony, even the permissible CSAAS testimony regarding delayed disclosure was "not called for to 'assist the trier of fact.'"  Ibid. (citing N.J.R.E. 702).

However, the Court found the admission of CSAAS expert testimony was "harmless in light of the overwhelming evidence of [the] defendant's guilt."  Id. at 306.  That evidence included the victim's detailed testimony, an audio recording she made of one of the sexual assaults, including defendant's "[e]xplicit and disturbing language" that confirmed the victim's account, phone conversations law enforcement monitored between the victim and the defendant in which "he offered her money and other items after asking her to retract her accusations[,]" and eyewitness testimony from a friend of the victim's mother who witnessed the defendant in an aroused state "lying on top of the victim[.]"

16

Ibid. Under these circumstances, the Court concluded "admission of the CSAAS evidence . . . was harmless." Id. at 307.

In G.E.P., the Court reviewed the evidence in each of the four consolidated cases and affirmed only G.E.P.'s conviction. 243 N.J. at 393. There, in addition to the victim's testimony, the State introduced a recorded telephone call between the victim and G.E.P. providing "damning, compelling evidence of guilt[,]" and a bag of straps, rubber bands and clothespins seized from the defendant's office that corroborated the victim's testimony of sexual abuse. Id. at 390.

However, the Court agreed that we properly reversed the convictions of the other three defendants, R.P., C.P., and C.K., because the evidence in each of those cases was based largely on the testimony of the alleged victims, and in two cases, "witnesses that repeated [the victims'] allegations." Id. at 392. In those cases, "CSAAS testimony bolstering the alleged victims' testimony was 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached,' . . . and therefore was clearly capable of producing an unjust result. . . ." Ibid. (quoting Jordan, 147 N.J. at 422).

A.

Applying these principles to defendant's convictions on the sexual assault charges set forth in counts one through six of the indictment, we conclude that

17

the evidence presented by the State in this part of its case closely resembled the evidence it introduced in R.P., C.P., and C.K. The State relied upon the video-taped interview the police conducted with C.L. to support the six charges. None of the other individuals who testified, including W.K., witnessed any of the alleged assaults.

Notably, C.L. recanted her allegations two months after she made them and testified at trial that W.K. had persuaded her to fabricate her claims. Under these circumstances, the CSAAS testimony presented by Dr. Taska was critical to the State's case. Indeed, the prosecutor highlighted three of the five CSAAS behaviors in his summation, including recantation, in an attempt to demonstrate that C.L.'s retraction of her charges was not credible, while her initial interview with the police was trustworthy. Although defendant offered rebuttal CSAAS testimony through Dr. Esplin, we cannot presume it cured the error. See G.E.P., 243 N.J. at 392 (reaching a similar conclusion in the C.P. case, where "[t]he State's evidence consisted of [the child's] testimony, CSAAS expert testimony, and witnesses that repeated [the child's] allegations"). Therefore, we conclude that the admission of the improper CSAAS testimony concerning the sexual abuse charges clearly had the capacity to lead the jury to a result it otherwise would not have reached on counts one through six.

In so ruling, we have considered, but rejected, the State's argument that there were two items of evidence that "strongly" corroborated C.L.'s initial allegations. First, the State argues the child was able to describe the ointment that she alleged defendant put on his penis during the assaults and, therefore, this corroborated her account. However, the child also testified that she saw what the ointment looked like when she walked in on her father while he was using it while masturbating in his bedroom.

Thus, the question of how C.L. learned what the ointment looked like could only be answered by the jury making a determination of the child's credibility. Because the CSAAS testimony clearly affected the jurors' ability to resolve that issue, we are unable to conclude that the child's conflicting accounts provided the type of strong corroborating evidence needed to overcome the erroneous admission of the expert's opinions on this subject.

The only other piece of corroborating evidence that the State cites concerns the fact that C.L. suffered from enuresis and encopresis prior to her disclosure of the assaults. The State points out that Dr. Kinney testified that these conditions can be caused by stress. The State asserts that the child had these issues prior to defendant's arrest in 2010, and they cleared up thereafter. Therefore, the State posits that this timeline "supported [its] argument that these

19

conditions were brought on by the stress of defendant's assaults[,]" which ended after he was arrested.

This argument lacks merit. As noted above, Dr. Kinney testified that a number of different non-medical factors other than stress could have caused C.L.'s condition, including constipation, poor hygiene, and behavioral issues. Dr. Kinney never opined that C.L. suffered from stress and instead testified that the child was "very friendly" and "upbeat." Thus, Dr. Kinney's limited testimony in this case did not provide the type of corroborative evidence needed to overcome the error in permitting the introduction of the CSAAS testimony.

Because the admission of this evidence was not harmless error, we are constrained to reverse defendant's convictions on counts one through six of the indictment.

## B.

We do not reach the same conclusion with regard to defendant's convictions on the child pornography charges set forth in counts seven and eight of the indictment. The CSAAS testimony was not relevant to those charges, which the State was able to establish without referring to C.L.'s interview with the police or Dr. Taska's testimony.

20

Instead, the State relied upon Bachok's testimony concerning the forensic analysis of defendant's two computers. On defendant's laptop, Bachok found "numerous images of suspected child pornography," C.E.L., (slip op. at 27), which was more than sufficient to sustain a conviction under count seven for possession of child pornography.

With regard to the charge of tampering with evidence by attempting to delete these images under count eight, Bachok discovered evidence on both computers that they had been "wiped" using the "system restore" feature and the Cyberscrub program. In addition, Bachok found that an attempt was made to delete materials from defendant's laptop only ten minutes after he spoke on the telephone to his wife, who had just learned of C.L.'s allegations. While defendant blamed K.W. for the illegal material Bachok found on the computers, and K.W. claimed he was responsible, the jury was able to resolve these credibility questions against defendant without reference to the CSAAS testimony. Therefore, there was ample evidence in the record to support defendant's conviction of this offense.

Under these circumstances, we discern no reason to disturb defendant's convictions on the child pornography charges set forth in counts seven and eight. Therefore, we affirm both of these convictions.

A-5783-13

III.

In sum, we reverse defendant's convictions on counts one through six of the indictment because of the admission of the improper CSAAS testimony, and we remand for further proceedings consistent with this opinion. We affirm defendant's convictions on counts seven and eight. The remainder of defendant's assertions on the original appeal remain without merit, as discussed in our first opinion. C.E.L., (slip op. at 40-89).

Affirmed in part; reversed in part; and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5783-13