Filed 9/30/25  P. v. Ruiz CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALFREDO ORTEGA RUIZ,<br><br>    Defendant and Appellant. | D086171<br><br><br>(Super. Ct. No. RIF1905203) |

APPEAL from a judgment of the Superior Court of Riverside, John M. Davis, Judge.  Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Alfredo Ortega Ruiz molested his stepdaughter D.A. multiple times from when she was around 15 years to 17 years old.[1] When D.A.'s sister C.R. was between 11 and 14 years old, Ortega Ruiz molested C.R. once. D.A. eventually disclosed the abuse. Following an investigation, the People charged Ortega Ruiz with molesting both D.A. and C.R.

Before trial, the People moved in limine to present expert testimony about child sexual abuse accommodation syndrome (CSAAS). Ortega Ruiz did not object, and the court granted the motion. The CSAAS expert explained common behaviors of child molestation victims. At the end of trial, the court instructed the jury using the version of CALCRIM No. 1193 in effect at the time. The jury found Ortega Ruiz guilty of all counts.

On appeal, Ortega Ruiz challenges the admissibility of CSAAS testimony and the use of CALCRIM No. 1193. Specifically, he claims the court erred in admitting the expert testimony on CSAAS because it has been "debunked" by the originator of the concept. He also contends CALCRIM No. 1193 misstates the law by instructing the jury it may use CSAAS to evaluate victim credibility, and it misleads jurors into using CSAAS as direct proof of guilt.

We conclude Ortega Ruiz forfeited these arguments by failing to object. Even if the arguments were not forfeited, we would conclude they lack merit. Accordingly, we affirm.

---

[1] The first amended information lists D.A.'s age at the time of abuse as 14 and 15, which differs slightly from the ages provided by her testimony.

FACTUAL AND PROCEDURAL BACKGROUND

The People charged Ortega Ruiz with one count of lewd act on a child under the age of 14 (Pen. Code,[2] § 288, subd. (a); count 1), five counts of lewd act on a child 14 and 15 years old and more than 10 years younger than the defendant (§ 288, subd. (c)(1); counts 2 through 6), and a misdemeanor count of annoying or molesting a child (§ 647.6, subd. (a); count 7).  The amended information also alleged a serious prior offense, a strike prior, and two aggravating factors.

A.    *Pretrial Motions*

The prosecution filed a motion in limine seeking to introduce expert testimony to dispel common misconceptions about child abuse and to explain the victims' "self-impeaching" behavior, such as delayed disclosure or recantation.  The prosecutor confirmed the expert's testimony would be generic and generalized.  Defense counsel did not object to the admission of CSAAS testimony.  He asked for leeway to cross-examine the expert about the theories and the opinions behind the theories, as well as whether the expert had read any articles about false child abuse allegations.  The prosecutor objected to eliciting any testimony about percentages or ratios about false disclosures by victims.  The trial court granted the motion in limine but clarified it would not permit any questions or testimony that included percentages or ratios of false disclosures.

B.    *D.A.'s Testimony*

When D.A. was in high school, she lived in a home with her stepfather Ortega Ruiz, her sister C.R., her two half-brothers, and her mother.

---

[2]    Further undesignated statutory references are to the Penal Code.

Ortega Ruiz first molested D.A. when she was roughly 15 years old. They were alone in a bedroom watching TV under the covers. Ortega Ruiz put his hand over D.A.'s pants, covering her vagina. Then, he unbuckled her pants and placed his hand under her underwear. When she pushed his hand away, he tried a second time. He said something like, "Come on. It's just my finger. It's not going to do anything to you."

The next time Ortega Ruiz touched D.A., she was alone in the garage, doing laundry. He walked in, closed the door, and forcibly kissed her, holding her face in his hands. He also fondled her breasts under her bra. He touched her in a similar manner at least a dozen other times in the garage. He also touched and kissed her in his bedroom.

When D.A. was about 16 and a sophomore in high school, when no one else was home, he directed her into the bathroom and instructed her to watch him masturbate. He also put his hand in her pants, under her underwear, and rubbed her vagina. With prompting, D.A. estimated it lasted 15 minutes. When D.A.'s mother knocked on the front door of the home to be let in, Ortega Ruiz told D.A. to run into her room. She obeyed and pretended to be asleep. D.A. initially could not remember how many other times Ortega Ruiz touched her in a similar manner. When asked again, she agreed it happened more than twice.

Another time, a naked Ortega Ruiz entered D.A. and C.R.'s room. D.A. told C.R., with whom she shared a bed, "Stay under the bed [covers] and pretend [to be] asleep." D.A. coughed loudly to draw attention, and her mother entered the room. Her mother asked Ortega Ruiz what he was doing and ordered him to leave before D.A. and C.R. woke up and saw him. D.A. did not remember how old she was when this happened.

4

When D.A. was about 17, Ortega Ruiz molested her multiple times. Once, Ortega Ruiz and D.A. were alone, lying in bed. He locked the bedroom door. He had his pants off and pulled D.A.'s pants down. He put his hand on her vagina and started rubbing it. He was playing with himself and tried to make D.A. sit on top of him. After about 20 minutes, he got dressed and left; D.A. pretended to fall asleep.

During another incident, D.A., her mother, and Ortega Ruiz were in bed. D.A.'s mother left to go check on the food, and Ortega Ruiz took D.A.'s hand and forced it on his penis, skin to skin. He put his hand over hers and started stroking himself. D.A. initially could not remember how many times Ortega Ruiz forced her to touch his penis, then offered at least three times.

Another time, Ortega Ruiz and D.A. were in his room, lying in bed when he turned on an electric razor with tape over where the blades should be. He placed it in D.A.'s vagina.

One incident occurred in the living room. D.A. and her sister were sitting on either side of Ortega Ruiz on the couch, covered with a blanket. He first touched D.A. Then she saw movement under the blanket on C.R.'s side. C.R. got up and ran, so D.A. used that excuse to run after her. C.R. disclosed to D.A. what happened. D.A. told C.R. she would take care of it. She did not speak with Ortega Ruiz after she heard what C.R. said.

D.A. did not disclose the molestation to an adult during the two years it occurred. D.A. told C.R. when she was considering speaking up about it.

D.A. initially did not remember disclosing the molestation to her mother. Once the prosecutor refreshed her recollection with a transcript of an earlier interview between D.A. and a social worker, she recalled telling her mother. Her mother did nothing about the abuse.

5

D.A. disclosed to her aunt that Ortega Ruiz tried touching her. D.A. testified her aunt reported it to the police, but Ortega Ruiz and her mom told police, "No, everything is okay here. You guys can go."

Within a month of disclosing the molestation to her aunt in December 2019, D.A. told a teacher that Ortega Ruiz was making her sleep in the garage, even though this was untrue. D.A. thought if she did not exaggerate, she might not get help because when she told her mother, her mother did nothing. D.A. told child protective services that she lied to her teacher about sleeping in the garage.

D.A. thought if she disclosed the molestation, the family would fall apart. She did not want the family to break up. She also was afraid nothing would happen in response to her allegations, or Ortega Ruiz would hit her.

Before D.A. disclosed the molestation, the police had been to the family home multiple times due to reports of domestic violence. The police spoke with D.A., but she did not disclose the sexual abuse. She pretended everything was "okay," and they were doing "fine."

The defense questioned D.A.'s credibility and asked about her motives. D.A. testified that a day or two before Ortega Ruiz was arrested for molestation, he cleared out the room D.A. used and made her sleep elsewhere. Also, her parents had various arguments about child custody in the event of divorce, and D.A. would witness Ortega Ruiz hitting her mother. The defense also asked D.A. about inconsistencies between her trial testimony and her interviews with the police and social worker. And counsel questioned D.A. about specific incidents she disclosed for the first time in trial. For instance, she never told social workers or law enforcement about the time where Ortega Ruiz entered her room naked, with an erect penis.

6

C.    *C.R.'s Testimony*

C.R. was about 11 years old when Ortega Ruiz molested her. D.A. and C.R. were sitting on either side of Ortega Ruiz on the couch in the living room. He grabbed at C.R. under the blanket, and she pushed him away. C.R. got up and said she was going to sleep and went back to her room. She spoke to D.A. about the incident within days of it occurring.

C.R. only reported the abuse by Ortega Ruiz to D.A. However, C.R. told police and the social worker about the abuse when they interviewed C.R. in response to D.A.'s disclosure.

The defense challenged C.R.'s credibility by cross-examining her about inconsistencies between her testimony and D.A.'s testimony, as well as inconsistencies within C.R.'s own statements. For example, D.A. testified that she followed C.R. to the room when C.R. ran out after the sofa incident, but C.R. testified they first discussed it a few weeks or months after the fact, then she did not remember. C.R. initially testified she did not disclose the abuse to her mother, but she said otherwise to the social worker and the police.

D.    *The Aunt's Testimony*

The aunt testified that D.A. once told her Ortega Ruiz was engaging in sexual misconduct, but she did not believe D.A. because Ortega Ruiz behaved differently around her. She did not report to police what D.A. disclosed, but she did tell D.A.'s school.

E.    *The People's CSAAS Expert*

Dr. Jody Ward, a clinical and forensic psychologist, testified as an expert about CSAAS. As part of her testimony, she explained her limited role. She was there to talk generally about how children respond to sexual abuse. She would not form opinions or offer insight into any of the people

7

involved in the case. Her purpose was not to assist the jury with whether the victims were telling the truth, or whether the defendant committed the crimes. She did not know anything about the facts or details of the case, had not reviewed any of the police reports, and had not interviewed any witnesses. She was present only to discuss CSAAS, which is a pattern of behavior that many children exhibit when they have been sexually abused. CSAAS helps understand why children do what they do in response to sexual abuse because it can be counterintuitive.

Dr. Ward described CSAAS as "a group of symptoms that are thought to be—a pattern of behaviors that are thought to come from a certain cause, sexual abuse." It cannot be used in hindsight to determine whether the symptoms were the result of sexual abuse. She acknowledged that Dr. Roland Summit, who originally coined the term "child abuse accommodation syndrome" wished he had called it a pattern of behaviors or child sexual abuse accommodation pattern, rather than a "syndrome."

Unlike children who have been abused by strangers, children who have been abused by people with whom they have an ongoing relationship tend not to report the abuse right away, and they tend not to be believed because it does not fit society's idea of how sexual abuse should occur.

Dr. Ward described the five elements of CSAAS: secrecy, helplessness, entrapment and accommodation, disclosures that are delayed or unconvincing, and retraction or recantation. Secrecy refers to how abuse occurs in secret because witnesses rarely observe it. Also, children tend to keep the sexual abuse secret for very long periods of time.

Helplessness refers to the power imbalance between adults and children because children are dependent on adults to meet their basic needs. A child in a sexually abusive situation does not have enough self-sufficiency

8

to escape the relationship. Thus, children find other ways to cope with ongoing abuse.

Entrapment and accommodation refer to why abusers believe they can repeatedly abuse children: Because children tend to keep the abuse a secret for long periods. When children become entrapped, they learn ways to accommodate the abuse, including by acquiescing and believing they must put up with the sexual abuse to receive the positive aspects of the relationship—such as financial support from the perpetrator, making the child feel special—things that may not be obvious to an outsider. Also, children may unwittingly put themselves in sexually abusive situations. Sometimes they develop blind spots because they do not recognize they are in danger or in an abusive dynamic.

During the abuse, children may disassociate as a coping mechanism. Disassociating can affect memory. As with any autobiographical memory, peripheral details about a memory fades, but the gist of the memory remains the same. When sexual abuse occurs repeatedly with similar incidents, victims tend to group the events into one memory of what normally occurred. They may not be able to give a particular date or small details.

Research shows that children typically wait before reporting. They usually disclose the abuse piecemeal and over time, depending on the receptiveness of the other person.

Recantation or retraction refers to some children's minimization or reversal of abuse claims in response to post-disclosure events. Once children disclose sexual abuse, they go through intrusive interviews with police, social workers and other professionals. Their families split apart. They may be taken out of the home and put in protective custody. The perpetrators, with whom the children had close relationships, are now facing serious

consequences due to the disclosure. So, children sometimes recant allegations.

Helplessness always applies, and child abuse almost always occurs in secret. The other factors may or may not be present.

F. *Ortega Ruiz's Testimony*

Ortega Ruiz testified that as D.A. grew up, she became belligerent and disobedient toward him. He denied any sexual abuse, domestic violence, or physical discipline. Ortega Ruiz had been completely impotent for 20 years.

Forty-eight hours before Ortega Ruiz's arrest, he and his wife argued over possible divorce and child custody. He opined the molestation accusations were made up to take his sons away from him.

G. *Jury Instructions*

Without objection and after the close of evidence, the court provided the jury with a modified version of CALCRIM No. 1193 that instructed the jury on how it may use CSAAS testimony in its deliberation.[3]

The instruction as read stated:

"You have heard testimony from [Dr. Jody Ward] regarding child sexual abuse accommodation syndrome.

"[Dr. Jody Ward]'s testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him.

"You may consider this evidence only in deciding whether or not [D.A.'s and C.R.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

---

[3] The court instructed the jury with the version of CALCRIM No. 1193 that was current in July 2022. CALCRIM No. 1193 was modified in September 2022, after this trial. (Jud. Council of Cal., Advisory Com. Rep., Crim. Jury Instns. (Sept. 2022).)

H.     *Verdict and Sentencing.*

The jury convicted Ortega Ruiz of all seven counts.  The trial court struck a prior strike and found both aggravating factors true.  The court sentenced Ortega Ruiz to nine years and four months in state prison, with a one-year sentence running concurrently.

DISCUSSION

I.

*The Court Did Not Abuse its Discretion by Admitting CSAAS Evidence*

Ortega Ruiz contends the court erred by admitting CSAAS evidence because CSAAS is no longer valid psychology.

We review the admission of expert testimony for an abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) " '[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.'  [Citation.]" (*Id.* at p. 430.)

A.     *Ortega Ruiz Forfeited any Objection to the Admission of CSAAS Testimony*

Ortega Ruiz did not object to the admission of CSAAS expert testimony. Instead, his attorney negotiated the type of cross-examination in which he could engage.  This request implicitly approved of the admission of the CSAAS evidence.  Because he did not object to the admission of this evidence, he forfeited any challenge to it.  (*People v. Jasso* (2025) 17 Cal.5th 646, 674; Evid. Code, § 353.)

B.     *Ortega Ruiz Does Not Demonstrate Ineffective Assistance of Counsel*

Ortega Ruiz contends his attorney's failure to object to the admission of CSAAS evidence demonstrates ineffective assistance of counsel.  (See *Strickland v. Washington* (1984) 466 U.S. 668, 687–688.)  However, an attorney's "[r]epresentation does not become deficient for failing to make meritless objections." (*People v. Ochoa* (1998) 19 Cal.4th 353, 463 (*Ochoa*).)

11

As Ortega Ruiz acknowledges, our Supreme Court has held that CSAAS evidence is relevant and admissible. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*).) The superior court was bound by the Supreme Court's decision in *McAlpin*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales, Inc.*) [explaining lower courts must follow Supreme Court precedent under the doctrine of stare decisis].) Thus, objecting to the admission of the CSAAS testimony would have been futile. Accordingly, we cannot conclude the failure to object to the admission of the evidence demonstrates deficient representation. (See *Ochoa,* at p. 463.)

Even if the issue were not forfeited, we would nonetheless find no error.

C.   *CSAAS's Evidence Has Not Been "Debunked"*

Ortega Ruiz contends the original basis of CSAAS has been "debunked," because Dr. Summit wrote a follow-up article "to address 'subsequent distortions that court misuse has imposed,'" implying the evidence is invalid.[4] (See Roland C. Summit, *Abuse of the Child Sexual Accommodation Syndrome*, Vol. I(4), (1992) Journal of Child Sex Abuse, p. 153.) Therefore, he argues, the CSAAS testimony should have been excluded. He also directs us to *State v. J.L.G.* (N.J. 2018) 234 N.J. 265, 271 (*J.L.G.*), a New Jersey state court opinion that considered Dr. Roland's follow-up article when it disallowed the use of four of the five CSAAS elements. He asks us to follow its example. We decline.

---

[4]   Ortega Ruiz implies that Dr. Summit's follow-up article repudiates court use of CSAAS evidence in court, contending the basis for allowing CSAAS has been "debunked." The journal article was not considered by the trial court or provided to us. We reviewed the article. Although we do not base our decision on our review (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [absent extraordinary circumstances, courts of appeal do not consider matters not presented to the trial court]), we disagree with Ortega Ruiz's interpretation of the article's conclusions.

First, we do not find *J.L.G.* persuasive.  There, the defendant challenged the admissibility of CSAAS evidence on the ground that it was not sufficiently reliable to meet New Jersey's evidentiary standards or the test of scientific reliability under *Frye v. United States* (DC Cir. 1923) 293 F. 1013 (*Frye*).  (*J.L.G., supra*, 234 N.J. at pp. 279–280, 292, 301.)  However, California courts do not apply *Kelly/Frye*[5] to CSAAS evidence.  As the court explained in *People v. Munch* (2020) 52 Cal.App.5th 464, 473 (*Munch*), this type of expert testimony is based on clinical experience and professional literature in the area "meets 'traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly/Frye*].' [Citations.]"  (*Id*. at p. 473.)  Thus, the basis for the court's decision in *J.L.G.* does not apply here.

Second, Ortega Ruiz acknowledges California courts have found CSAAS testimony is proper.  Our Supreme Court has concluded expert testimony about child sexual abuse accommodation syndrome is admissible because it can assist the trier of fact (Evid. Code, § 801, subd. (a)) by providing information to help jurors evaluate the evidence.  (*McAlpin, supra,* 53 Cal.3d at pp. 1300–1301.)  Thus, even were we to believe that we should follow *J.L.G.*'s lead, we would not do so.  (See *Auto Equity Sales, Inc., supra,* 57 Cal.2d at p. 455; *People v. Ramirez* (2023) 98 Cal.App.5th 175, 216 [*McAlpin* decision is binding on admissibility of CSAAS evidence regardless of contrary decisions from other jurisdictions].)

Ortega Ruiz argues we are not constrained by *McAlpin*, contending lower courts are not bound by Supreme Court opinions that are "based on an erroneous determination of historic fact."  (*In re Javier A.* (1984) 159

---

5      *People v. Kelly* (1976) 17 Cal.3d 24.

Cal.App.3d 913, 954 (*Javier A.*).)[6] But the court in *Javier* ultimately concluded it was compelled by *Auto Equity* to follow Supreme Court precedent. (*Id.* at pp. 952–956.) We likewise conclude we are bound by our Supreme Court's decisions. There was no abuse of discretion.

## II.

### *The Court Did Not Err By Instructing the Jury with CALCRIM No. 1193*

Ortega Ruiz contends CALCRIM No. 1193 misstates the law by allowing the jury to use CSAAS to evaluate victim credibility and misleads the jury into using CSAAS as direct proof of guilt.

We review claims of instructional error de novo. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) " '[W]e examine the instructions as a whole. The test we apply is whether there is a reasonable likelihood the jurors would have understood the instructions in a manner that violated a defendant's rights. [Citation.] In this regard, we presume that jurors are intelligent individuals who are capable of understanding instructions and applying them to the facts of the case before them.' [Citations.] ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' [Citation.]" (*People v. Webb* (2018) 25 Cal.App.5th 901, 906.)

A.    *Ortega Ruiz Forfeited His Objection to CALCRIM No. 1193*

Ortega Ruiz acknowledges he failed to object to the use of CALCRIM No. 1193. He argues he did not forfeit the issue on appeal because an

---

[6]    *Javier* does not address CSAAS evidence. It asked whether a "juvenile may be constitutionally denied a right to jury trial in a delinquency proceeding where his wardship and consequent loss of freedom depends upon proof beyond a reasonable doubt that he committed a specified felony." (*Javier A., supra,* 159 Cal.App.3d at pp. 918–919.)

14

inaccurate jury instruction affects a substantial right. (§ 1259.) We conclude Ortega Ruiz forfeited the issue on appeal, (see *People v. Lang* (1989) 49 Cal.3d 991, 1024), but even were we to consider the argument on the merits, we would conclude there was no instructional error.

B.      *CALCRIM No. 1193 Is an Accurate Statement of Law*

Ortega Ruiz contends CALCRIM No. 1193 misstates the law because it says the jury may use CSAAS "in evaluating the believability of [the victims'] testimony." (See CALCRIM No. 1193.) He argues the current instruction allows a jury to use CSAAS testimony as "direct proof of the defendant's guilt." But he also recognizes that "a number of opinions have concluded that CALCRIM No. 1193 accurately instructs on the limited use of CSAAS evidence."

We agree with those courts concluding the version of CALCRIM No. 1193 used at Ortega Ruiz's trial "accurately informs the jury on the limited use of CSAAS evidence" and "does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof." (*People v. Lapenias* (2021) 67 Cal.App.5th 162; see also *Munch, supra*, 52 Cal.App.5th at pp. 473–474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*).)

The portion of CALCRIM No. 1193 that permits jurors to use CSAAS information to evaluate the believability of a victim's testimony does not misstate the law. "[I]t is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of child abuse. [Citations.]" (*Lapenias, supra*, 67 Cal.App.5th at p. 171; *McAlpin, supra*, 53 Cal.3d at pp. 1300–1301.)

15

Further, CALCRIM No. 1193 informs jurors that the CSAAS testimony is "not evidence that the defendant committed any of the crimes charged against him." (CALCRIM No. 1193.) Thus, the instruction helps minimize the possibility of the jury conflating CSAAS with evidence of guilt.[7] (*People v. Flores* (2024) 101 Cal.App.5th 438, 458, 459, fn. 5.)

DISPOSITION

The judgment is affirmed.


IRION, Acting P. J.

WE CONCUR:


DO, J.


BUCHANAN, J.

---

[7] Because we conclude the version of CALCRIM No. 1193 used was an accurate statement of law, Ortega Ruiz could not have been prejudiced by its use.

16