# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE
## APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2488-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SEGUNDO SANCHEZ,

    Defendant-Appellant.

_____

Argued January 21, 2026 – Decided March 6, 2026

Before Judges Gilson, Firko, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 20-08-0034.

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Brian Uzdavinis, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Acting Attorney General, attorney; Brian Uzdavinis, of counsel and on the brief).

PER CURIAM

Defendant Segundo Sanchez had numerous communications with an undercover detective who was posing as a fourteen-year-old girl. In his communications, defendant repeatedly asked the presumed girl to come to his house to have sex. He also sent the girl pictures of his penis and a pornographic video.

A jury convicted defendant of four crimes: second-degree luring or enticing a child, N.J.S.A. 2C:13-6(a); second-degree attempted sexual assault, N.J.S.A. 2C:14-2(c)(4) and N.J.S.A. 2C:5-1; third-degree attempted endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) and N.J.S.A. 2C:5-1; and third-degree attempted distribution of obscenity to a minor, N.J.S.A. 2C:34-3(b)(2) and N.J.S.A. 2C:5-1. Defendant was sentenced to six years in prison and required to register and report under Megan's Law, N.J.S.A. 2C:7-1 to -23.

On appeal, defendant contends that the trial court made two errors by excluding testimony from a proposed expert and giving incorrect jury instructions on the attempt charges. Because the expert was seeking to offer a net opinion without any established scientific basis, we reject defendant's arguments concerning the exclusion of the expert. We also reject defendant's arguments concerning the jury charge because the instructions were properly

A-2488-23

molded and there was no plain error. Accordingly, we affirm defendant's convictions and sentence.

## I.

We summarize the facts from the evidence presented at defendant's trial. In 2019, a female detective with the New Jersey State Police (NJSP) was conducting an undercover operation for the Internet Crimes Against Children Unit (ICAC). The detective posed as a fourteen-year-old girl named Annie Hute on Skout, a social networking application, which allowed users to electronically chat with other people through texts, pictures, and videos. Skout requires users to be adults and the detective testified she listed Annie's age as eighteen and in Annie's profile used a picture of a female detective from the NJSP who, looked young, but was actually in her mid to late twenties.

On April 13, 2019, defendant, who used the name "Shony," contacted Annie's Skout account and asked Annie to send a picture of herself and invited her to his house. Defendant's primary language was Spanish, and he used a translation application to communicate in English. The detective responding as Annie, stated that she could not drive and eventually told defendant that she was "14" years old. The detective also sent a photo of the other female detective from the NJSP in a tank top.

A-2488-23

Defendant responded by offering to send an Uber to pick Annie up and bring her to his house. In reply, the detective stated "[m]y mom said Uber is dangerous," and asked "[w]hat [do] you wan[t to] do?" Defendant replied "[k]iss you all, love. Come, and sex, mama." After acknowledging that Annie was a virgin, defendant messaged "I'm going to suck your vagina," and "[w]e will have good sex." When the detective messaged that she could not come over at that time and repeated her age of fourteen, defendant continued to offer to order an Uber for Annie to come to his house. He also sent Annie several pictures of his penis.

The detective then exchanged phone numbers with defendant, and their communications continued through text messages. Defendant asked for Annie's address, and the detective shared her location with defendant through a different social networking application called "WhatsApp."

Following April 13, defendant and the detective, posing as Annie, continued their communications through WhatsApp for the next four months.[1] During those communications, defendant continued to request that Annie engage in sex with him, and "Annie" repeatedly told defendant how young she was. For example, when explaining why she could not come to defendant's house,

---

[1] WhatsApp does not display the age of a user to other users.

 A-2488-23

"Annie" told defendant she was busy with school, her mom would not let her, and she had summer camp.

On another occasion, the detective messaged defendant: "I never drank alcohol before," and when defendant suggested he could buy beer for her, she stated "[y]ou remember how old I am, right[]?" To which defendant responded "14, 15." "Annie" sent a message back stating that she was fourteen years old.

The detective also told defendant several times that Annie was a virgin and that she did not "have much experience." In response, defendant repeatedly asked to meet for sex. He also asked Annie to send photos of herself naked. In another communication, defendant sent Annie a link to an adult pornographic video through WhatsApp.

On August 14, 2019, "Annie" finally agreed to meet with defendant. The detective provided defendant with an address and defendant ordered an Uber to pick up "Annie," and bring her to his house. The detective took the Uber ride to defendant's home, with other NJSP detectives following the Uber in separate vehicles. During the ride, defendant asked to see another picture of Annie and the detective sent him a picture "mainly showing [her] hair" because the detective did not look like a young girl.

 A-2488-23

When the detective arrived at defendant's house, she called him and asked him to come outside to get her from the Uber. Defendant exited his house and as he approached the Uber, he was arrested by several NJSP detectives. When arrested, defendant had a cell phone and a subsequent search of the phone confirmed that it was the device that had been used to contact and communicate with Annie.

Thereafter, a grand jury indicted defendant for the crimes: luring, attempted sexual assault, attempted endangering the welfare of a child, and attempted distribution of obscenity to a minor. Defendant pled not guilty.

Before trial, defendant retained a psychological expert witness, Dr. Zachary Yeoman, who assessed defendant in April 2021, and thereafter produced a report. In his initial report, Dr. Yeoman described defendant's behavior towards Annie as an "isolated" incident. He reasoned that because defendant did not come to the United States until he was nineteen, his grasp of the English language was poor, and he did not understand American customs, "such as going to camp as a child." Thus, Dr. Yeoman reasoned defendant likely interpreted Annie's messages differently than a native speaker would. Dr. Yeoman also suggested that defendant likely paid little attention to the conversations he had with Annie because he was pursuing several women on

6

Skout at the time and did so while drinking. Lastly, Dr. Yeoman described a cognitive bias known as "anchoring bias," under which a person will sometimes focus on factual information first received and disregard conflicting factual information received later. He opined that anchoring bias, "cultural factors," and defendant's state of sexual arousal probably resulted in defendant disregarding Annie's statements that she was fourteen years old. In that regard, he stated:

> In the end, it is my opinion to a reasonable degree of psychological certainty, that the combination of cultural factors, anchoring bias, and sexual arousal induced decision-making impairment impacted Mr. Sanchez's state of mind such that he could not accurately process the conflicting information presented to him and dismissed information that did not fit with his belief that the alleged victim was an adult.

The State moved to preclude defendant from using Dr. Yeoman or his report. In response, Dr. Yeoman submitted a supplemental report. In that report, the doctor acknowledged that "anchoring bias in cases such as Mr. Sanchez's cannot be scientifically studied." He also admitted that his "application of the anchoring bias in cases such as Mr. Sanchez is novel," and that "it is unlikely that psychologists have had the opportunity to apply the concept of anchoring bias to cases like this before." He went on to state:

7

> There is no way to test whether anchoring bias caused Mr. Sanchez's behavior in the present matter. Instead, anchoring bias is present in all human decision-making, and in the context of his case, it is a better explanation for his behavior than more problematic explanations. Even if I were to have administered psychological testing to determine whether Mr. Sanchez functions like most other humans in this way, the results would still not be conclusive about the presence of anchoring bias during Mr. Sanchez's alleged illegal behavior.

After hearing argument, the trial court granted the State's motion and issued a written opinion dated September 29, 2022. In its decision, the court concluded that Dr. Yeoman's report constituted a net opinion. The court also found that "the state of the field of anchoring bias is not sufficiently reliable in connection to sexual offenses against children," and that Dr. Yeoman lacked expertise in the "field of anchoring bias as related to sexual crimes against children." Additionally, the court reasoned that nothing in the expert's report was beyond the ken of the average juror. Thus, the court excluded the defense's expert witness.

Defendant moved for reconsideration, and the motion was heard by the trial judge, who was a different judge than the judge who had originally excluded defendant's proposed expert. After hearing argument, the trial judge denied the motion for reconsideration on the record on April 5, 2023.

A-2488-23

The trial judge reasoned that "there[ is] simply no evidence in . . . the doctor's report to support with any reasonable degree of certainty that Mr. Sanchez did what he did . . . because of anchoring bias." The judge went on to conclude "we can let experts testify about a lot of things, but there has to be some relation to the facts in the case at hand and [in this matter] there simply is not."

Defendant's trial was then conducted in April 2023. At trial, the detective described to the jury all the communications she had had with defendant, and copies of the communications were entered into evidence. The defense called defendant's mother, his brother, and his employer. The defendant also testified.

In his testimony, defendant explained that he was born in 1989, had moved to New Jersey from Ecuador in 2011, spoke primarily Spanish, and was not fluent in English. He also stated that he had been using Skout frequently in 2019, often messaging with three to four women a day. Defendant admitted to communicating with the Annie profile on Skout but stated that he did not believe Annie was a minor because the pictures of Annie looked like an adult woman, and because he thought she was lying or joking when she said she was fourteen.

After hearing all the testimony and considering the evidence, the jury convicted defendant on all four counts. On March 20, 2024, defendant was

A-2488-23

sentenced. On the conviction for luring, defendant was sentenced to six years in prison and required to register under Megan's law. On the conviction for attempted sexual assault, defendant was sentenced to a concurrent prison term of six years. His other convictions were merged with the luring conviction. Defendant now appeals from his convictions.

## II.

On appeal, defendant makes two arguments, which he articulates as follows:

> POINT I – THE TRIAL COURT INFRINGED ON [DEFENDANT'S] RIGHT TO PRESENT A COMPLETE DEFENSE BY BARRING A PSYCHIATRIC EXPERT REPORT THAT WOULD HAVE SUPPORTED HIS DEFENSE THAT HE BELIEVED HE WAS SPEAKING TO AN ADULT.
>
> A.   The expert reports.
>
> B.   The initial motion-to-bar-testimony hearing and written decision.
>
> C.   The reconsideration hearing and decision.
>
> D.   The initial motion court's decision to bar the testimony under N.J.R.E. 702 was legally erroneous because anchoring bias is outside the ken of the average juror, Dr. Yeoman was qualified to talk about it, and there was no reason to believe anchoring bias could not exist in [defendant's] circumstances.

A-2488-23

E.   The reconsideration judge's holdings that Dr. Yeoman's conclusions were net opinion, and that, in the absence of a conclusive showing that anchoring bias existed in [defendant's] case, any testimony at all about anchoring bias was irrelevant, were likewise erroneous and an abuse of discretion.

F.   The erroneous decisions of the two motion judges require a reversal of [defendant's] convictions.

G.   Although the record is sufficient to rule in favor of [defendant] on this issue, if this Court does not believe that the record adequately supports a full reversal, there should be a remand for a testimonial hearing with Dr. Yeoman.

POINT II – THE TRIAL COURT'S FINAL JURY CHARGES ERRONEOUSLY GAVE THE JURY TWO CONFLICTING INSTRUCTIONS FOR EACH ATTEMPT OFFENSE AND ERRONEOUSLY INCLUDED INAPPLICABLE LANGUAGE ABOUT IMPOSSIBILITY ATTEMPT.

A.   The trial court erroneously gave the jury two conflicting instructions for each attempt offense.

B.   The trial court erroneously included an inapplicable portion of impossibility attempt that abrogated the instructions on substantial step.

Neither argument is supported by the record or the law.

A.  The Exclusion of Defendant's Expert.

Appellate courts review a trial court's evidentiary ruling for abuse of discretion. Schwartz v. Menas, 251 N.J. 556, 570 (2022) (citing Rodriguez v.

11

Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019)). "A court abuses its discretion when its 'decision is "made without a rational explanation, inexplicably depart[s] from established policies, or rest[s] on an impermissible basis."'" State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020)). Moreover, a trial court's determination whether to qualify an expert witness is afforded "substantial deference." State v. Rosales, 202 N.J. 549, 562 (2010) (citing State v. Jenewicz, 193 N.J. 440, 455 (2008)). The burden rests on the proffering party to prove the expert testimony is admissible. Ibid. (citing Hisenaj v. Kuehner, 194 N.J. 6, 15 (2008)).

The admissibility of expert testimony is governed by N.J.R.E. 702 and N.J.R.E 703. N.J.R.E 702 states "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." This rule establishes three requirements for admitting expert testimony:

> (1) the subject matter of the testimony must be "beyond the ken of the average juror"; (2) the field of inquiry "must be at a state of the art such that an expert's testimony could be sufficiently reliable"; and (3) "the witness must have sufficient expertise to offer the" testimony.

12

[State v. J.L.G., 234 N.J. 265, 280 (2018) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)).]

N.J.R.E. 703 governs the foundation for an expert's testimony. It requires an expert's opinion "be grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence, but which is the type of data normally relied upon by experts.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)). "The corollary of that rule is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." State v. Townsend, 186 N.J. 473, 494 (2006). Accordingly, an expert is required to "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Crispino v. Township of Sparta, 243 N.J. 234, 257 (2020) (quoting Pierre, 221 N.J. at 54). In other words, the net opinion rule directs "that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Pierre, 221 N.J. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). In short, "[t]he net opinion rule is a 'prohibition against speculative testimony.'" Ehrlich v. Sorokin,

451 N.J. Super. 119, 134 (App. Div. 2017) (quoting <u>Harte v. Hand</u>, 433 N.J. Super. 457, 465 (App. Div. 2013)).

In this matter, both judges correctly excluded Dr. Yeoman's reports and proposed testimony. While the judges articulated different reasons for the exclusion, there are two grounds for excluding the expert. First, Dr. Yeoman's reports demonstrate that he was seeking to offer net opinions. Dr. Yeoman's reports expressly disclaim any ability to determine what defendant actually believed concerning Annie's age. In that regard, he acknowledged he could not determine if anchoring bias, or any other factor, affected defendant's actions regarding Annie. For example, Dr. Yeoman stated: (1) "anchoring bias in cases such as Mr. Sanchez's cannot be scientifically studied," (2) "[t]here is no way to test whether anchoring bias caused Mr. Sanchez's behavior in the present matter," and (3) "[e]ven if I were to have administered psychological testing to determine whether Mr. Sanchez functions like most other humans in this way, the results would still not be conclusive about the presence of anchoring bias during Mr. Sanchez's alleged illegal behavior."

In short, Dr. Yeoman conceded that he could not say if anchoring bias had any effect on the defendant's actions in this case. Although Dr. Yeoman did state that "anchoring bias is present in all human decision-making," and "is a

14

better explanation for [defendant's] behavior than more problematic explanations," that opinion was mere speculation. Without pointing to evidence to support his views, Dr. Yeoman's opinions were "bare conclusions, unsupported by factual evidence." Funtown Pier Amusements, Inc. v. Biscayne Ice Cream & Asundries, Inc., 477 N.J. Super. 499, 516 (App. Div. 2024) (quoting Buckelew v. Grossbard, 87 N.J. 512, 524 (1981)).

Moreover, Dr. Yeoman's proposed opinions regarding "cultural factors," and defendant's presumed state of sexual arousal are even more unmoored from a factual foundation. Accordingly, all the proposed opinions were inadmissible net opinions.

Second, Dr. Yeoman's reports failed the second prong of N.J.R.E. 702, which requires an expert's testimony to be "sufficiently reliable." J.L.G., 234 N.J. at 280 (quoting Kelly, 97 N.J. at 208). Up until 2023, New Jersey courts applied the "general acceptance" standard from Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), to determine whether an expert's testimony is reliable. See State v. Olenowski (Olenowski I), 253 N.J. 133, 143 (2023) ("In criminal cases up until now, this Court has used the Frye standard to assess reliability."). The Frye standard required courts to assess an expert's proposed opinions to ensure they were "deduced from a well-recognized scientific

principle or discovery," and were "sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014.

In February of 2023, however, the New Jersey Supreme Court in Olenowski I held that going forward criminal courts should apply a modification of the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). 253 N.J. at 151-52. That test requires courts to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 147 (emphasis omitted) (quoting Daubert, 509 U.S. at 592-93). The Court also held that "[i]n determining if the scientific methodology is sound and well-founded, courts should consider whether others in the field use similar methodologies." Id. at 146 (alteration in original) (quoting Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449 (1991)).[2]

---

[2] The Court identified four non-exhaustive factors to consider:

> (1) whether the scientific theory or technique can be, or has been, tested; (2) whether it "has been subjected to peer review and publication"; (3) "the known or potential rate of error" as well as the existence of standards governing the operation of the particular scientific technique; and (4) general acceptance in the relevant scientific community.

The decision in <u>Olenowski I</u> was issued in February 2023. While the original motion was decided in 2022, the reconsideration motion was decided in April 2023. Thus, the <u>Olenowski I</u> rule governed. 253 N.J. at 151-52.[3]

In <u>State v. Olenowski (Olenowski II)</u>, 255 N.J. 529, 580-81 (2023), the Supreme Court adopted a hybrid appellate review standard to assess "the bona fides of an expert's methodology" and its application to a case:

> Going forward, we hold that in New Jersey criminal and quasi-criminal cases in which the trial court has admitted or excluded an expert witness based upon <u>Daubert</u> reliability factors, our appellate courts shall review that reliability determination de novo. However, other case-specific determinations about the expert evidence—such as whether the witness has sufficient expertise, whether the evidence can assist the trier of fact in that case, and whether the relevant theory or technique can properly be applied to the facts in issue—should be reviewed for an abuse of discretion.
>
> [Olenowski I, 253 N.J. at 147 (quoting <u>Daubert</u>, 509 U.S. at 593-94).]

A review of Dr. Yeoman's reports establishes that none of these factors supports admitting his proposed testimony.

---

[3] Nevertheless, even under the <u>Frye</u> standard, defendant's expert's opinions were not admissible. Dr. Yeoman put forward no proof that the field of anchoring bias in the context of child sex crimes has "gained general acceptance." <u>Frye</u>, 293 F. at 1014. Indeed, Dr. Yeoman conceded that his application of anchoring bias to this matter was "novel."

17

Dr. Yeoman conceded his proposed opinions were not supported by any accepted scientific studies, evidence, or methodology. In that regard, Dr. Yeoman acknowledged the "application of the anchoring bias in cases such as Mr. Sanchez is novel," and that "it is unlikely that psychologists have had the opportunity to apply the concept of anchoring bias to cases like this before." Consequently, Dr. Yeoman's proposed opinions were not scientifically valid or reliable.

Having conducted a de novo review of the record, we conclude that Dr. Yeoman's reports and proposed testimony was not reliable. We also determine that both judges correctly excluded Dr. Yeoman's reports and proposed testimony because his opinions failed to satisfy N.J.R.E. 702 and N.J.R.E. 703.

B. The Trial Court's Jury Instruction on Attempt.

In his second argument, defendant contends that the trial court committed reversable error by giving conflicting instructions regarding the three attempt offenses. He also asserts that the trial court erroneously included inapplicable language from the impossibility attempt instruction in its instructions on substantial step attempt.

Proper jury instructions in a criminal case "are essential to a fair trial." State v. McKinney, 223 N.J. 475, 495 (2015) (quoting State v. Green, 86 N.J.

18

281, 287 (1981)). Inaccurate instructions on a material issue "are presumed to be reversible error." State v. Lopez, 187 N.J. 91, 101 (2006) (quoting State v. Marshall, 173 N.J. 343, 359 (2002)). Thus, "[e]rroneous instructions are poor candidates for rehabilitation as harmless, and are ordinarily presumed to be reversible error." McKinney, 223 N.J. at 495-96 (alteration in original) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)).

When a reviewing court examines a jury charge, it "must not look at portions of the charge alleged to be erroneous in isolation; rather, 'the charge should be examined as a whole to determine its overall effect,' … and 'whether the challenged language was misleading or ambiguous.'" Id. at 494 (citations omitted) (first quoting State v. Jordan, 147 N.J. 409, 422 (1997); and then quoting State v. Nelson, 173 N.J. 417, 447 (2002)). Therefore, in a case where the defendant alleges that parts of the jury instructions were erroneous, "[t]he test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." Id. at 496 (alteration and omission in original) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

Defendant did not object to the jury instructions at trial. Accordingly, we review these issues for plain errors. State v. Funderburg, 225 N.J. 66, 79 (2016).

19

Under that standard, an appellate court will "disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). The New Jersey Supreme Court has explained:

> [I]n the context of jury instructions, plain error is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [McKinney, 223 N.J. at 494 (second alteration in original) (quoting State v. Camacho, 218 N.J. 533, 554 (2014)).]

Defendant acknowledged the trial court correctly read the model jury charge for substantial step attempt. See Model Jury Charges (Criminal), "Attempt (N.J.S.A. 2C:5-1)," at 2-4 (rev. June 15, 2009). Defendant, however, claims the court modified the jury charges for the three attempted offenses, to include language about attempt. In that regard, the trial court inserted the words "attempted" and "purposefully" into the model charges for sexual assault, endangering, and distribution of obscenity to a minor. Defendant argues the trial court should have read the model jury charges for the three offenses (sexual

assault, endangering the welfare of a child, and distribution of obscenity to a minor), without any change in their wording.

When read in context, the jury charges properly instructed the jury on the concept of attempt as applied to the three offenses. The language the trial court added about attempt was not confusing or misleading. Instead, the court molded the model jury charge for each offense to include language and elements from the model jury charge on substantial step attempt. The model charge states that a defendant commits a substantial step attempt when he or she "[p]urposely does or omits to do anything which, under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in the course of conduct planned to culminate in his [or her] commission of the crime." See Model Jury Charges (Criminal), "Attempt (N.J.S.A. 2C:5-1)," at 2 (rev. June 15, 2009).

In charging the jury the trial court molded the instruction on each underlying offense to include the elements of substantial attempt. For example, in charging the jury on attempted sexual assault, the court explained each of the four elements of the offense, integrating the words "attempted" and "purposely" where appropriate. The court similarly molded the charges for endangering and distribution of obscenity to a minor.

A-2488-23

Having reviewed the charges in their entirety, we discern no reversible error in the molding of the instructions. Indeed, trial courts should mold jury instructions. State v. Concepcion, 111 N.J. 373, 379 (1988); see also State v. R.B., 183 N.J. 308, 325 (2005) (explaining that while model jury charges should be followed, they may be "modified to meet the facts adduced at trial").

We also reject defendant's contention that the trial court committed plain error by including "an inapplicable portion of impossibility attempt that abrogated the instructions on substantial step." Defendant claims the trial court erred when, after reading the correct substantial step instruction, it later added language from the impossibility instruction and told the jury:

> If the accused purposely engaged in conduct that would constitute the crime of sexual assault had the facts been as a reasonable person would have believed them to be, you should consider that conduct as evidence of guilt of attempt to commit sexual assault. It does not matter that defendant failed to accomplish his intended result because the facts were not as a reasonable person would have believed them to be. It is no defense that defendant could not succeed in reaching his intended result because of circumstances unknown to him; however, there cannot be an attempt to commit a crime unless the attempt, if completed, would have constituted a crime.
>
> [See Model Jury Charges (Criminal), "Attempt (N.J.S.A. 2C:5-1)," at 2-3 (rev. June 15, 2009).]

22

Defendant asserts this instruction, which was given in connection to both the attempted sexual assault and endangering charges, was not applicable or relevant to the charges against him. Defendant, however, is trying to narrowly focus on a few words and he ignores the overall instructions. When read in full context, the jury was properly instructed, and there was no misleading language that would have confused the jury. Indeed, the jury was read the model jury charge for substantial step attempt several times as defendant concedes. Accordingly, the trial court did not misstate the law in a way that "possessed a clear capacity to bring about an unjust result." McKinney, 223 N.J. at 494 (quoting Camacho, 218 N.J. at 554).

In summary, having reviewed all of defendant's arguments, we reject them as not supported by the record and law. Thus, we affirm defendant's convictions and sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division